Marquis Who's Who, Inc., Browne & Storch, Inc., Philip Berman, Louis Berman & Co., Hibbard, Spencer, Bartlett & Co., E. W. Murdock, J. Murdock, Cinema Processors, Inc., Chicago Dock Canal Trust, A. Bartimoccia, The Greater North Michigan Avenue Association, and Howard L. Storch, Plaintiffs-Appellants, v. Ohio-St. Clair Garage Corporation, Women's Athletic Club of Chicago, Harris Trust & Savings Bank, Trust No. 14455, Baird and Warner, Inc., Gertrude K. Hamilton, Lake Shore National Bank, Arthur T. Galt, et al., Benjamin E. Sherman and Son, B. E. Tewes, Time, Incorporated, H. W. Sherman Corporation, Normlyn Corporation, First National Bank, State Bank and Trust Company, M. S. Sharp, 218 E. Ontario Building, C. Bonas, S. Magglos, J. Meyers, H. Gilden, Brokers Building, Bowes Realty Company, Commerce Mart, Zoning Board of Appeals of City of Chicago, B. Emmet Hartnett, John P. Kringas, Hubert F. Messee, Karl M. Vitzhum, Sidney Smith, Building Commissioner of the City of Chicago, and Sam D. Kaplan, Defendants-Appellees.

Gen. No. 52,270.

First District, Fourth Division.

April 17, 1968.

King, Robin, Gale & Pillinger, of Chicago (J. William Braithwaite and Leroy J. Tornquist, of counsel), for appellants.

Raymond F. Simon, Corporation Counsel, of Chicago (Marvin E. Aspen and Edmund Hatfield, Assistant Corporation Counsel, of counsel), and Oscar M. Nudelman, of Chicago, for appellees.

MR. JUSTICE DRUCKER delivered the opinion of the court.

Plaintiffs [1] appeal from a judgment entered in an administrative review in the Circuit Court upholding the decision of the Zoning Board of Appeals of the City of Chicago which granted a special use to the Ohio-St. Clair Garage Corporation. Defendants contend that plaintiffs have not established that they were adversely affected by the decision of the Zoning Board of Appeals and therefore were not entitled to challenge the decision by way of administrative review. Plaintiffs argue that they were entitled to an administrative review and that the decision

[1] On July 12, 1967, St. Clair Hotel, one of the appellants, was voluntarily dismissed. On September 6, 1967, another appellant, Chicago House for the Friendless, was granted leave to withdraw. Another appellant, Appelgate Leason & Co., has also withdrawn from this appeal.

of the Board should be reversed and plaintiffs given a new hearing because one of the four votes necessary to grant the special use was cast by a board member who was not present at all the proceedings.[2] Plaintiffs also urge that the court erred in refusing to call the Chairman of the Board of Appeals as a witness.

To obtain an administrative review plaintiffs must prove that they are adversely affected by the decision of the Board (Rosenfeld v. Zoning Board of Appeals of Chicago, 19 Ill App2d 447, 451, 154 NE2d 323) and that they have suffered a "special or peculiar injury." 222 E. Chestnut St. Corp. v. Board of Appeals of the City of Chicago, 14 Ill2d 190, 152 NE2d 465. Defendants assert that no such injury has been shown.

Defendant Ohio-St. Clair Garage Corporation applied for a variation in the nature of a special use to the Zoning Board of Appeals on June 2, 1966, proposing to build a four-story parking facility on the southwest corner of Ohio and St. Clair Streets. The first floor was to contain retail stores and the top three floors were to be devoted exclusively to parking. Plaintiff Howard L. Storch of Browne & Storch, a real estate firm which owned and managed a number of properties in the area, sent the Board a letter objecting to the proposed use because it would create traffic congestion and would block the proper development of the area. The Board also received letters authorizing Storch to object on behalf of the St. Clair Hotel (located directly across the street of the subject property) [3] and Louis Berman & Co. (owners of nearby

---

[2] Ill Rev Stats, 1965, c 24, § 11–13–3, provides for a Board of Appeals of five members in a municipality of more than 500,000 and requires the concurring vote of four board members "to decide in favor of the applicant." Plaintiffs contend that the board member who did not attend all of the proceedings could not effectively vote thus rendering the decision invalid. This provision was revised by the Legislature in 1967 so that only three concurring votes are now required.

[3] See note 1.

property). Others of the plaintiffs also communicated with the Board. Marquis Who's Who, Inc., sent an objection virtually identical word for word to that sent by Storch. The Greater North Michigan Avenue Association wrote the Board objecting to the manner of construction of the proposed facility and stated that: "We . . . will work energetically with . . . the applicant . . . to upgrade the present parking structure proposal . . . ." Later the Association, of which Howard L. Storch is a vice-president, wrote letters suggesting that the site be used for a business or residential structure with off-street parking included and objecting to the construction of a building which would house a parking facility exclusively. The Board also received letters from the Chicago Dock & Canal Trust and Bowes Realty Co.

A hearing on the special use application was set for June 30, 1966. One of the five board members had died, creating a vacancy on the Board which was not filled during the proceedings involved here. All four of the remaining board members were present on June 30 and voted to continue the hearing until September 14. At the hearing held on September 14 Chairman B. Emmet Hartnett was absent and the hearing was conducted by the three remaining board members. The Board met with the same three members on September 16 and again on November 22, when it passed a resolution approving the special use application. Although Chairman Hartnett was absent from these meetings, according to the minutes of the Board he "concurred in taking the action designated on the face of the resolutions."

At the hearing of September 14 the objectors presented four witnesses in support of their objections. Howard L. Storch stated that he had been in the real estate business in the area of the subject property for thirty-eight years and that this special use would substantially damage the surrounding property because it would start a precedent for gasoline stations and because it would take up

one of the few remaining plots, thereby stopping the proper development of the area. He also testified that the parking facility would cause traffic congestion, create safety hazards and attract vagrants and that although such facilities were appropriate to the area west of Michigan Avenue they were incompatible with the properties to the east. He said that he had offered to buy the property in question and lease it back for a parking lot. One of the board members referred to a letter on file with the Board which Storch had written to the president of the applicant corporation stating:

> I am sure it would be far better for you to let us negotiate a ground lease with one of the major developers, making a condition of this transaction a long-term lease on large garage facilities in its base; this would provide you both with the profit of the garage operation as well as income from the land; in effect, you can have your cake and eat it too!

Carl Gardner testified that he was a city planning and zoning consultant. He asserted that the proposed use was incompatible with the surrounding uses; that it would create backups onto Michigan Avenue and that this use would interfere with the proper development of the area. On cross-examination he said that the best use for the land would be for a highrise apartment with parking built into the structure.

Kenneth Anglemire, president of Marquis Who's Who, Inc., which owns the property diagonally across from the subject property, said that the proposed use would impair the value of his company's building because it would interfere with the type of development which is expected to be carried over from Michigan Avenue and because it would create a pedestrian hazard.

Philip Berman, president of Louis Berman & Co., stated that he agreed with the testimony of Anglemire and that the garage exits would stop people from walking on this

street, cheapen the neighborhood and hurt retail business on Michigan Avenue.

The applicant offered the testimony of four witnesses. Sam D. Kaplan, president of the applicant, stated that he talked to Philip Berman and was told that Mr. Berman himself had no objection but was just going along with the property owners association. He said that he also talked to Leo Wallach of the St. Clair Hotel and was told that he saw no objections to the garage and that in fact the hotel needed a garage but that he would want to talk to someone else before committing himself. Kaplan further testified that there was a need for parking in this area and that the cars would be hidden from view by precast metal grill work.

Norman Kraemer testified that he was the operator of the city parking facility located one block away at Grand and St. Clair. He said that there was a growing need for parking in the area and that this need would soon be increased because certain parking facilities, which he named, were giving way to the construction of buildings eliminating facilities for 750 cars.

William Horowitz testified that he was an architect and had drawn plans for the proposed garage. He said that the building would use architecturally finished concrete and that through use of concrete parapets and aluminum screening devices the parked cars would not be visible from the street.

John J. Mack testified that he was a real estate developer and was familiar with the area in question. He said that Kaplan had come to him for suggestions on how to best develop the subject property and that he had advised Kaplan that a multistory apartment building was not economically feasible. He said he based his estimate on a 248-unit building. Mr. Mack stated that the contemplated parking facility would not hurt the area and that it was more attractive than many buildings already there.

■ ■ Plaintiffs have argued that they will be adversely affected by this special use because of pedestrian hazards, interference with the development of the area and traffic congestion. Although both Anglemire and Berman asserted that this garage would constitute a pedestrian hazard, neither was an expert nor was any reason advanced by them for this conclusion. Storch's assertion that the garage would attract vagrants is equally without evidentiary support. Storch and Gardner testified that this use was incompatible with the proper development of the area. However, the Chicago Department of Development and Planning, which is required to make recommendations to the Board on all special use applications, approved this use. The real estate developer John Mack said that he saw no incompatibility between this use and the surrounding property. Kaplan and Kraemer testified that there was a positive need for parking facilities in the area and there was no testimony to the contrary. Finally, the objectors asserted this use would cause traffic congestion. However, the Chicago Department of Streets and Sanitation submitted a written report stating: "We have no objections from a traffic standpoint . . . ." We also note that Storch was willing to have a ground level parking lot there and both he and Gardner favored a high-rise building with built-in-garage facilities. Furthermore, in Exchange Nat. Bank v. Village of Skokie, 86 Ill App2d 12, 229 NE2d 552, in considering a contention that an auto laundry would cause more traffic congestion than other business uses, we stated at page 20:

> The traffic on Skokie Boulevard was shown to be 16,000 cars per day, whereas plaintiff's proposed operation would involve 200 to 300 to possibly 500 cars per day. It should be noted, however, that there is no evidence that the auto laundry would introduce into the area any substantial volume of traffic not presently there as through traffic or as a result of

79

existing patronage of the other businesses in the area. We find defendant's argument on the question of traffic congestion to be without merit.

In the instant case Mr. Gardner, the expert, was the only witness for plaintiffs who testified to traffic congestion with any specificity. He said:

> The traffic on Ohio Street is very heavy. The actual last count that I was able to get from official sources was for 1961. At that time the count was 44,000 and some on a typical week day two directional count and I would have to factor that up considerably for the increase of traffic in the last five years.

We cannot conclude that the proposed garage with a capacity to park 130 vehicles would add significantly to the congestion of traffic on Ohio Street.

At best the objectors' opinions amount to a conclusion that a garage is "less desirable" than a highrise building. In 222 E. Chestnut St. Corp. v. Board of Appeals of the City of Chicago, 14 Ill2d 190, 152 NE2d 465, the court stated at page 194:

> Nor do we believe that the testimony of present tenants, to the effect that the parking lot will render their apartments less desirable, permits us to take judicial notice that plaintiff's building will be depreciated in sale and rental value.

> . . . . . .

> Here there is a complete absence of proof relating to the value of plaintiff's property and of the effect the parking lot will have on such values. It is true, as plaintiff suggests, that the proximity of certain uses will depreciate the rental value of nearby property, but we have found no authority holding that a

mere showing of the existence of such use relieves a party from affirmatively proving alleged damage to his property . . . .

We do not believe that plaintiffs have sustained their burden of proving the special injury required to obtain administrative review. We, therefore, need not decide the other points raised.

The judgment is affirmed.

Affirmed.

McCORMICK, P. J. and ENGLISH, J., concur.